Commonwealth *v.* Spencer, Appellant.

Argued November 12, 1970. Before JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

330

*John W. Packel*, Assistant Public Defender, with him *Vincent J. Ziccardi*, Defender, for appellant.

*Richard Max Bockol*, Assistant District Attorney, with him *Milton M. Stein*, Assistant District Attorney, *James D. Crawford*, Deputy District Attorney, *Richard A. Sprague*, First Assistant District Attorney, and *Arlen Specter*, District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE JONES, March 25, 1971:

This is an appeal from the judgment of sentence imposed by the Common Pleas Court of Philadelphia. With two judges concurring in the result, the Superior Court affirmed. *Com. v. Spencer*, 216 Pa. Superior Ct. 169, 263 A. 2d 923 (1970). We granted allocatur.

The charges against appellant stem from an unlawful entry into the apartment of a Patricia Fitzgerald on July 3, 1967. While in her bedroom, Mrs. Fitzgerald was suddenly confronted by a man brandishing a pistol who ordered her to move toward the bed. Fearing a possible rape and/or harm to her six-year-old daughter, Mrs. Fitzgerald began screaming and the man fled. Appellant was later arrested, indicted and found guilty by two juries on the charges of assault and unlawful entry.[1]

On appeal we are confronted with two distinct issues: (1) whether it was reversible error for the trial

---

[1] Prior to the trial in question, appellant was acquitted, by a different judge and jury, of the charges of burglary and rape but found guilty of assault and unlawful entry. Subsequent thereto, the first trial judge granted appellant's motion for a new trial because of certain errors in the charge. Retried on the lesser offenses of unlawful entry and assault before a second judge and jury, appellant was convicted and sentenced, after disposition of post-trial motions, to a term of imprisonment not less than one year nor more than two years on the assault charge and a term of five months to one year on the unlawful entry charge.

court to permit the introduction of certain identification testimony; and (2) whether the court erred in the use of the "Allen" charge. (*Allen v. United States*, 164 U.S. 492, 501, 502 (1896)).

Following appellant's arrest, a police stand-up[2] with three other men was conducted at the East Detective Division at Front and Westmoreland Streets in Philadelphia on July 6, 1967, and appellant was identified by Mrs. Fitzgerald as the man who entered her apartment. Since counsel was neither present nor waived in this stand-up occurring twenty-four days after the United States Supreme Court delivered its landmark decisions in *United States v. Wade*, 388 U.S. 218 (1967), and *Gilbert v. California*, 388 U.S. 263 (1967), it would be error to admit any evidence pertaining to the stand-up or any in-court identification evidence which is tainted by the stand-up. A reading of the preliminary hearing record convinces us, as it convinced *both* trial judges, that any identification by Mrs. Fitzgerald based on appellant's dental make-up would be improper since Mrs. Fitzgerald first noticed that irregularity during the stand-up. Nonetheless, the second trial judge inadvertently permitted a testimonial identification of appellant based on his teeth.[3]

---

[2] In the jargon of the Philadelpiha Police Department, a stand-up occurs when a series of men *individually* confront the identifying witness whereas a line-up involves the same set of men *collectively* presented to the identifying witness. However, the two terms are so loosely interchanged in the record that we cannot determine, with certainty, whether appellant was identified in a line-up or a stand-up. In the posture of this particular appeal, the distinction is academic since counsel was not present. See, e.g., Com. v. Whiting, 439 Pa. 205, 266 A. 2d 738 (1970).

[3] Though the same counsel represented appellant at both trials and should have been aware of the correct basis for objection to the dental identification, counsel instead based his objection on the Fifth Amendment privilege against self-incrimination, which was overruled. Rather than impugn either the defense attorney or

Although the admission of the "dental" testimony tainted by the stand-up identification was error, Mrs. Fitzgerald's testimony was not objected to by defense counsel and her in-court identification was unequivocal in all respects, at all stages of these proceedings, and we conclude the receipt into evidence of this improper identification testimony was harmless error within the meaning of *Harrington v. California,* 395 U.S. 250 (1969), and *Chapman v. California,* 386 U.S. 18 (1967). *See, e.g., Com. v. Williams,* 440 Pa. 400, 405-08, 270 A. 2d 226, 228-30 (1970) (concurring opinion). However, we recognize that this conclusion begs the question whether the other courtroom identification by this witness had an origin independent of the illegal stand-up or whether it was similarly tainted.

We begin with the proposition enunciated in *Wade,* that, "[w]here, as here, the admissibility of evidence of the line-up identification itself is not involved, a per se rule of exclusion of courtroom identification would be unjustified." 388 U.S. at 240. While realizing that a line-up will ofttimes "crystalize the witnesses' identification of the defendant for future reference," *id.,* the Supreme Court held "the proper test to be applied in these situations is that quoted in *Wong Sun v. United States,* 371 U.S. 471, 488, ' "[w]hether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959).' " 388 U.S. at 241. Because it could not be determined from

the second trial judge, we will consider the matter to be a mere oversight on the part of both. In this manner we are not confronted with the situation of a second judge relitigating the suppression order, especially since the second judge indicated at the outset of the trial he would consider himself bound by the first judge's order suppressing any dental identification testimony.

the record whether the courtroom identification in *Wade* and *Gilbert* had an independent origin, the Supreme Court, in both cases, found it necessary to "vacate the conviction pending a hearing to determine whether the in-court identification had an independent source," 388 U.S. at 242. *See, also,* 388 U.S. at 272. The same procedure was employed by this Court in *Com. v. Whiting*, 439 Pa. 205, 266 A. 2d 738 (1970). However, on these facts, we find such remand to be unnecessary since the first judge conducted an independent inquiry of the witness' other identification and concluded it was not tainted. *See, e.g., Com. v. Williams*, 440 Pa. 405-08, 270 A. 2d 226, 228-30 (1970) (concurring opinion).

Applying the *Wade* standards, we note: (1) the complainant observed the man identified as appellant for five to ten minutes in a brightly lit room; (2) there was no substantial discrepancy of physical description between any pre-stand-up description and the appellant's actual description; (3) complainant identified appellant through photographs prior to arrest; (4) the complainant consistently identified the appellant at every stage of these proceedings and testified she would "never forget his face"; and (5) there was only a three-day interval between the alleged act and the stand-up. Accordingly, we conclude: (1) the witness' courtroom identification, apart from the dental testimony, was not tainted by the illegal stand-up and (2) this unequivocal courtroom identification renders harmless the error in permitting the dental identification.

Secondly, appellant urges us to reverse his conviction because of the trial judge's use of the so-called "Allen" charge. The second trial commenced on January 13, 1969, and the jury retired to deliberate after hearing the judge's initial charge at 11:13 a.m. on January 17, 1969. At 4:40 p.m. on the same date, the foreman of the jury reported an inability to reach a verdict on both counts as the jury was hopelessly deadlocked.

At that point the prosecutor requested, at side-bar, that the judge charge the jury in accordance with *Allen v. United States,* 164 U.S. 492, 501-02 (1896),[4] and the defense objected. Reluctant to so charge the jury, the trial judge sent the jury back for further deliberation and held a conference on the record in his chambers at 5:10 p.m. Present at the conference was the District Attorney of Philadelphia who requested the *Allen* charge if for no other reason than to test its continuing validity and the trial judge agreed.

After the jury returned to the courtroom, the trial judge, substantially quoting *Allen,* charged as follows: " 'In a large proportion of cases absolute certainty cannot be expected. Though a verdict must be the verdict of each individual juror and not a mere acquiescence to fellow jurors, nonetheless juries should examine the question of guilt or innocence with candor and with proper regard and deference to the opinions of each other. It is the duty of the jury to decide the case if they can conscientiously do so. The jury should listen with a disposition to be convinced to each other's arguments. If much the larger number of the jurors are fully convinced, a dissenting juror should consider whether his doubt is a reasonable one if it made no

---

[4] The charge in *Allen* was substantially as follows: ". . . although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority."

impression upon the minds of so many other jurors, equally as honest and as intelligent as himself. While undoubtedly the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments, and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment, or that he should close his ears to the argument of men . . .', and I will add parenthetically women, '. . . who are equally honest and intelligent as himself . . .' and I add as herself."

The jury then returned for further deliberation and later had dinner between 6:20 p.m. and 8:00 p.m. Returning to the courtroom at 9:51 p.m. for an account of one witness' testimony, the judge ordered the playback of a tape recording of that witness at 10:45 p.m. Upon hearing the recordings, the jury again retired. Finally, at 12:20 a.m., January 18, 1969, the jury returned verdicts of guilty on both counts.

In the past this Court has held that a conviction will be reversed if the jury's verdict was effectively coerced by the trial judge's charge: *Com. v. Wilmer*, 434 Pa. 397, 254 A. 2d 24 (1969) (initial charge) ; *Com. v. Holton*, 432 Pa. 11, 247 A. 2d 228 (1968) (supplemental charge). *See, also, Jenkins v. United States*, 380 U.S. 445 (1965). Hence the precise issue is whether the *Allen* charge has such a coercive effect.[5]

---

[5] Thoroughly researching the thought of many commentators as well as the precedents in other jurisdictions, the Third Circuit,

The thrust of appellant's attack on the *Allen* charge is directed toward that portion emphasizing that the jurors in the minority should both listen with deference to the jurors in the majority and re-examine their minority position. Two implications may be created by these propositions: (1) a minority juror should yield to the majority; and (2) those with no reasonable doubt, *i.e.,* the majority, need not re-examine their position despite the existence of a reasonable doubt in the mind of a minority juror.[6] It cannot be overemphasized that each notion is contrary to the hallowed tradition of trial by jury secured by both our federal and state constitutions: U. S. Const., art III, §2 and amend. VI; Pa. Const., art. I, §6. Thus, we can agree with the vast majority of jurisdictions that the Allen charge contains these *potential* abuses. Moreover, we share the Third

---

in United States v. Fioravanti, 412 F. 2d 407 (3rd Cir. 1969), *cert. denied,* 396 U.S. 837 (1969) and the Superior Court below prospectively abolished the use of the Allen charge. Since the date of those decisions, we note that the Court of Appeals for the District of Columbia, while not deciding the Allen charge is per se coercive, has adopted the ABA guide lines. Thomas v. United States, 8 Cr. L. 2141 (CA D.C. Nov. 6, 1970). In a similar fashion, the Maryland Court of Special Appeals held it to be error for a trial judge, *sua sponte,* to interrupt the jury's deliberation and give the Allen charge. Fletcher v. Maryland, 8 Md. App. 153, 258 A. 2d 781 (1969). On the other hand, the Fourth Circuit recently held that reading the Allen charge to a deadlocked jury was not error. United States v. Sawyers, 423 F. 2d 1335 (4th Cir. 1970). *See, also,* Note, *On Instructing Deadlocked Juries,* 78 Yale L. J. 100 (1968).

[6] A third problem enunciated by the Superior Court and the Third Circuit involves the criminally accused's right to a unanimous jury: "Inherent in a defendant's right to a verdict by a unanimous jury is his right to a new trial should the jurors fail to agree," 216 Pa. Superior Ct. at 174, 263 A. 2d at 926. *See, also,* 412 F. 2d at 416. Like the Supreme Court, "[w]e intimate no view whether or not the requirement of unanimity is an indispensable element of the Sixth Amendment jury trial." Williams v. Florida, 399 U.S. 78, 100 n. 46 (1970). Any discussion of this point is irrelevant in light of the already noted problem.

Circuit's view in *United States v. Fioravanti,* 412 F. 2d 407 (3d Cir. 1969), *cert. denied,* 396 U.S. 837 (1969), that the *Allen* charge should not be employed by the trial judges of this Commonwealth after the date of this opinion.

Our ruling herein on the *Allen* charge is prospective and applicable only to trials which take place after the date of this decision. *Cf. Great Northern Ry. v. Sunburst Oil & Refining Co.,* 287 U.S. 358 (1932). As to trials which occurred prior to the date of this decision, we will deal with appeals from such trials on an ad hoc basis and will examine the trial record to determine whether or not the *Allen* charge unduly influenced the jury.

In the case at bar, we have independently examined the record and are persuaded by the rationale of the Superior Court: "the jurors in the instant case were not coerced. The jury's verdict came seven hours after the Allen charge was given. In those seven hours, the jurors deliberated for three separate intervals. They also had what appears to have been a leisurely dinner. They were also sufficiently aware of their duty and their need of information to return to the courtroom to ask that certain testimony be read to them. This is not the mark of a coerced jury. Accordingly, we hold the giving of the Allen Charge in this case to be harmless." 216 Pa. Superior Ct. at 174, 263 A. 2d at 926.

Deadlocked juries are a matter of concern to both the bench and the bar. Recently, Standards Relating to Trial by Jury have been promulgated by the American Bar Association.[7] We commend these Standards as

---

[7] Those standards provide: "5.4 Length of deliberations; deadlocked jury (a) Before the jury retires for deliberation, the court may give an instruction which informs the jury: (i) that in order to return a verdict, each juror must agree thereto; (ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence

guide lines for the courts to follow when juries are deadlocked. *Accord, Thomas v. United States,* 8 Cr. L. 2141 (C.A. D.C. Nov. 6, 1970). Such guide lines may avoid the evils inherent in the Allen charge and with proper usage may aid in the alleviation of problems which arise when juries are deadlocked.

Judgment affirmed.

Mr. Chief Justice BELL took no part in the consideration or decision of this case.

Mr. Justice COHEN took no part in the decision of this case.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I endorse without reservation the majority's stated intention to forbid use of the Allen charge in trials that take place after the date of this decision and its approval and commendation for future trials of the jury instructions pertaining to deadlocked juries recommended by the ABA Project on Minimum Standards for Criminal Justice, Trial by Jury §5.4 (Approved Draft 1968). I must dissent, however, in light of the majority's purely prospective limitation of its ruling.

---

to individual judgment; (iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors; (iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and (v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict. (b) If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give or repeat an instruction as provided in subsection (a). The court shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals. (c) The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement." 3 Cr. L. Rptr. at 3215 (Approved Draft, 1968).

At the very least, that ruling ought to be applied to the appeal at bar.

It is not at all rare and indeed often wise for an appellate court to hold a newly created rule of law inapplicable to prior cases. Even in such cases, however, it has been the custom of this Court as well as that of the United States Supreme Court to apply the new rule at least to the very case in which it is announced. The rationale underlying this practice has been aptly summarized as follows: "At least two compelling reasons exist for applying the new rule to the instant case while otherwise limiting its application to cases arising in the future. First, if we were to merely announce the new rule without applying it here, such announcement would amount to mere *dictum*. Second, and more important, to refuse to apply the new rule here would deprive appellant of any benefit from his effort and expense in challenging the old rule which we now declare erroneous. Thus there would be no incentive to appeal the upholding of precedent since appellant could not in any event benefit from a reversal invalidating it." *Molitor v. Kaneland Community Unit District*, 18 Ill. 2d 11, 28, 163 N.E. 2d 89, 97 (1959).

These considerations are significant and apply with equal force to the instant case. I therefore dissent.