381 A.2d 114

**COMMONWEALTH of Pennsylvania**

v.

**Robert D. GARTNER, Appellant.**

**COMMONWEALTH of Pennsylvania**

v.

**Randy Lee PFAFF, Appellant.**

Supreme Court of Pennsylvania.

Argued March 14, 1975.

Decided Dec. 1, 1977.

Rehearing Denied Jan. 23, 1978.

516

Louis D. Musica, Meadville, for appellant in No. 29 March Term, 1975.

Michael J. Wherry, Grove City, for appellant in No. 30 March Term, 1975.

Paul D. Shafer, Jr., Dist. Atty., Ballard F. Smith, Jr., Asst. Dist. Atty., Meadville, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

ROBERTS, Justice.

After a joint trial, appellants Robert Gartner and Randy Pfaff were convicted by a jury of murder of the second degree [1] and aggravated assault.[2] Post-verdict motions were denied and sentences covering both offenses were imposed.[3]

1. 18 Pa.C.S.A. § 2502(b) (1974).

2. 18 Pa.C.S.A. § 2702(a)(4) (1974).

3. Gartner was sentenced to imprisonment for five to twelve years and Pfaff was sentenced to imprisonment for thirty months to six years. In addition, each was sentenced to pay the costs of prosecution and to make restitution to the family of the deceased and to the other victims for one-half of the hospital, medical and funeral expenses incurred as a result of the crime.

These appeals followed.[4] We affirm appellant Pfaff's convictions for both murder and aggravated assault. We reverse appellant Gartner's conviction for murder and affirm his conviction for aggravated assault. Because we are unable to determine what part of the sentence imposed on appellant Gartner was for the conviction on aggravated assault, we remand for re-sentencing on that conviction.

The murder convictions will be considered in Part I of this opinion, the common claims of Gartner and Pfaff relating to the assault convictions in Part II, and additional claims made by Gartner relating to the assault conviction in Part III.

The trial court's opinion on post-verdict motions summarized the facts:

"Around 9:15 P.M. on December 1, 1973, a verbal confrontation took place between a group of teen-age blacks and two young white teen-agers and their dates at a public park in Meadville, known as Diamond Park. The black youths had arrived at the scene in a car operated by Otis Mack and its passengers were Marlon Matthews (the deceased victim) and Clifford McClure. The two white youths, Delo and Perrine, sent their girl friends to a telephone to call additional help to the scene. The call was placed to the clubhouse of a local motorcycle club known as 'The Scorpions' and in short order Robert Gartner, Randy Pfaff and Larry Steele arrived in a car at the scene. The car was parked and as Gartner, Pfaff and Steele arrived, the confrontation had come to an end and the group of blacks was leaving in their car. Some words were exchanged between the three new arrivals and the departing blacks, and there was testimony that the departing car narrowly missed Gartner as he was standing near the edge of a street.

4. This Court has jurisdiction over the appeals from the murder convictions pursuant to the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp. 1977). Because the Commonwealth has not objected to consideration of the appeals from the aggravated assault convictions by this Court, our jurisdiction over those appeals is perfected. Id. § 503(a), 17 P.S. § 211.503(a); Pa.R.A.P. 741(a).

"As the confrontation broke up, the departing remarks by both groups, while somewhat conflicting, clearly indicated that the whites were going to 'the (Scorpion) Clubhouse' and if the blacks wanted to continue the confrontation they could find the whites at the clubhouse. One witness testified that someone in the blacks' car said, 'We'll be there,' and Delo responded with, 'I'll bet you $20.00 you won't.'

"In short order, Delo, Perrine and their two dates went to the Scorpion Clubhouse (about two to three miles from Diamond Park) and were followed by Gartner, Pfaff, Steele, Dalton Smith and Dominic Mottillo.

"Dalton Smith had been a late arrival at Diamond Park and attempted to ascertain what the trouble was about. He was told by Perrine that the blacks had been harassing them and following their car and were going to meet them at the clubhouse. Shortly, Gartner, Pfaff and Steele produced rifles from somewhere and set them in the corner of the clubhouse. The group sat around drinking beer for awhile. A short time later Gartner, Pfaff and Steele took their rifles and went outside the clubhouse. Gartner, armed with a loaded rifle, proceeded a short distance north of the clubhouse near some bushes where he had a clear view of the public highway and the driveway leading into the front of the clubhouse. The area was well lighted by an external building light and a street light. Pfaff, also armed with a rifle, proceeded to a location further from the highway and to the rear of the clubhouse and stationed himself on the hood of an abandoned car. The jury could easily have concluded that Gartner was to stand guard in the event of a 'frontal' attack or approach by the blacks and Pfaff was to guard against an attack from the 'rear.' The testimony is unclear as to where Steele was at the time of the shooting but he definitely left the clubhouse armed with a rifle at about the same time Gartner and Pfaff left.

"Meanwhile, while the whites had proceeded to the clubhouse, Mack, Matthews and McClure had proceeded to

a local teen-age center, stayed about forty minutes and then went to a local tavern owned by the parents of their friend, Richard Stinson. There, after some delay, they picked up Richard Stinson, Albert Stinson, Odell Wynn and Robert Wofford.

"After some time spent at the tavern talking, having a soft drink and getting everyone into the car, Mack proceeded to drive back through the city of Meadville and then proceeded south toward the Scorpion Clubhouse. The testimony of the blacks was confusing as to the exact reason they were going to the clubhouse but the jury could have easily concluded that it was to continue in some way the verbal argument and name calling that started in the park.

"The 'confrontation' at the Diamond Park ended about 9:30 P.M. and the testimony indicates that Mack and his black companions later arrived back at the Scorpion Clubhouse between 11:05 and 11:30 P.M.

"When Mack arrived, he pulled the front end of his car into the dirt driveway of the clubhouse and the undercarriage apparently 'hit bottom' and caused a loud thump. Someone from the clubhouse yelled, 'Hey, get out of here,' and Mack then backed the car out of the driveway and north on the paved road in preparation to proceed on south past the clubhouse. None of the blacks got out of the car and as the car was momentarily stopped on the paved road in preparation to proceed on south, Gartner fired a round from his position beside the road. Gartner was using a 7 mm bolt action Spanish rifle. As the car started to move south on the road, Gartner fired a second round. The first round was fired from a distance of about sixty-eight feet and the second from one hundred and forty-seven feet. The first round hit the undercarriage of the car, passed through three metal parts of the undercarriage, hit the frame and disintegrated. The second round was higher and hit the rear window molding, shattered the rear window and lodged in the head of a passenger, Marlon Matthews. Matthews died the next day. Two

others were also injured by the second round, apparently from flying glass, bits of metal or small separate fragments of the second bullet that killed Matthews.

"As the car sped down the road, Gartner, Pfaff and Steele came back to the clubhouse and in answer to inquiries as to who fired the shots, Gartner said he had. He told Dalton Smith he fired the shots but had a hard time seeing the front sights on his gun. Smith said someone asked Gartner if he hit the car and Gartner said no, he was too drunk and couldn't see the front sights.[5]

"Soon Pfaff produced two blankets, the three guns were wrapped in the two blankets and Smith agreed to 'keep' the guns for them. Smith hid them in a cemetery but later surrendered them to the police and testified as a Commonwealth witness.

"The Commonwealth's theory was that Gartner was the perpetrator of the crime but that Pfaff was equally guilty as an accomplice."

# I

## A.

■ Appellant Gartner contends that he must be granted a new trial on the charge of murder because the trial court refused a request that the jury be instructed on involuntary manslaughter.[6] We agree.

■ The trial court defined involuntary manslaughter in its charge, but instructed the jurors that they could not return a verdict of guilty to involuntary manslaughter because "you may not find a person guilty of a crime for which he is not charged under the circumstances in this case."

---

**5.** "Neither Gartner nor Pfaff testified and the defense presented no evidence." [footnote in original renumbered]

**6.** Appellant Gartner raises other objections to the instructions on murder. He contends (1) that the examples given by the court of the various types of criminal homicide were prejudicial and (2) that the trial court erred in refusing to charge the jury as requested on voluntary manslaughter. In view of our disposition of the murder conviction, we need not pass on these assignments of error.

This instruction was erroneous. In every prosecution for criminal homicide brought pursuant to the Crimes Code,[7] a defendant upon request is entitled to a jury instruction on involuntary manslaughter. *Commonwealth v. Smith*, 474 Pa. 559, 379 A.2d 96 (1977); *Commonwealth v. Garcia*, 474 Pa. 449, 378 A.2d 1199 (1977) (plurality opinion). The rationale of this rule is that under the Crimes Code, involuntary manslaughter is a lesser included offense of murder and thus is a permissible verdict when murder is charged. The court erred in its instruction because when an offense is a permissible verdict, the defendant is entitled to have the jury informed of its authority to return such a verdict. *Commonwealth v. Covil*, 474 Pa. 375 n. 6, 378 A.2d 841 n. 6 (1977) (voluntary manslaughter). Because the trial court instructed the jury that it could not return a verdict which under the Crimes Code it had the right to return, judgment of sentence on the conviction of murder of the second degree must be reversed and a new trial granted appellant Gartner.

## B.

Appellant Pfaff, however, has not raised on this appeal the trial court's refusal to instruct the jury on involuntary manslaughter. The issue therefore is not before us on his appeal. We therefore must consider his contention that the trial court erred in refusing to instruct the jury on voluntary manslaughter. In *Commonwealth v. Jones*, 457 Pa. 563, 319 A.2d 142 (1974) (plurality opinion), this Court held that a defendant tried for murder is entitled upon request to an instruction informing the jury of its power to return a verdict of voluntary manslaughter. *Jones* was decided on May 2, 1974; appellant Pfaff's trial began on February 13, 1974. Three members of this Court would apply *Jones* to all cases on direct appeal, including appellant

7. 18 Pa.C.S.A. §§ 101 et seq. (1973). Section 2501 of 18 Pa.C.S.A. provides:

"(a) Offense defined.—A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being.

(b) Classification.—Criminal homicide shall be classified as murder, voluntary manslaughter, or involuntary manslaughter."

Pfaff's. *Commonwealth v. Cain,* 471 Pa. 140, 171, 369 A.2d 1234, 1250 (1977) (Opinion in Support of Reversal of Roberts, J., joined by O'Brien and Manderino, JJ.). Three members would apply *Jones* only to cases in which trial began after *Jones* was decided. *Commonwealth v. Cain,* supra, 471 Pa. at 145, 369 A.2d at 1236 (Opinion in Support of Affirmance of Eagen, J., joined by Jones, C. J., and Pomeroy, J.). The Court being equally divided, appellant Pfaff's conviction for murder of the second degree is affirmed.

## II

Our disposition of the murder convictions rests upon grounds which do not affect the validity of the aggravated assault convictions. See *Commonwealth v. Palmer,* 467 Pa. 476, 482 n. 5, 359 A.2d 375, 378 n. 5 (1976). Therefore, we must consider appellants' contentions which do relate to those convictions. Appellants join in urging three assignments of error by the trial court: (1) refusal to declare a mistrial after an in-court outburst by the mother of the decedent, (2) denial of certain requests for disclosure of evidence known to the Commonwealth, and (3) allowing certain allegedly prejudicial evidence tags to be sent out with the jury. We find these contentions without merit.

The decedent's mother, Mrs. Hearn, was the Commonwealth's first witness. After completing her testimony, she took a seat in the front row of seats assigned to spectators. The trial court found that during the trial she exhibited "occasional tears and eye drying" and received "reassuring pats on the back and inaudible whispers from husband and friends." The trial court described the following events leading to the request for a mistrial:

"On the fourth day of trial during the testimony of the ballistics expert, the hat Marlon Matthews was wearing when shot in the head (with bullet hole therein) was introduced into evidence and Mrs. Hearn emitted an audible sound and started to sob. The Court immediately suspended trial, ordered the jury promptly removed from the courtroom and had Mrs. Hearn, who was visibly shak-

en and sobbing, taken from the courtroom by her husband and friends. She collapsed outside the courtroom, beyond the sight of the jury, and was taken to the hospital by ambulance.

"The jury box in the courthouse is so situated that when jurors are directing their attention to the witness stand, the bench and counsel tables, their backs are toward the audience and the seat occupied by Mrs. Hearn. While we believe that at least some of the jurors were aware of Mrs. Hearn's sobbing, most of the jurors were out of the courtroom as she was led sobbing out the door."

After the recess, the trial court strongly instructed the jury that it must not allow itself to be influenced by sympathy for the family of the decedent. In light of the minimal exposure of the jury to the display of emotion and the trial court's vigorous corrective action, we cannot say that it was error to refuse appellants' motion for a mistrial on the basis of this incident. Cf. *Commonwealth v. Martinolich*, 456 Pa. 136, 148–50, 154, 157, 318 A.2d 680, 687–88, 690, 692 (1974).

Appellants make two claims relating to failure of the Commonwealth to disclose information in its possession. First, they contend that the Commonwealth failed to comply with their timely requests for production of statements taken from its witnesses before trial, which appellants sought for use in cross-examination of those witnesses. Second, they assert that the trial court erred in failing to compel the Commonwealth to furnish the entire police investigatory file on the case for an in camera examination by the court to assure that all exculpatory material contained in the file was made available to appellants. We conclude that neither contention affords a basis for relief.

The Commonwealth called Otis Mack, Clifford McClure, and Odell Wynn as witnesses to the events leading to the death of Marlon Matthews. After each testified, appellants' counsel requested for use in cross-examination copies of any pre-trial statements which had been taken from those witnesses. The Commonwealth responded that no such state-

ments had been reduced to writing, but that Trooper Bey, the officer who had interviewed the witnesses, would testify later in the trial, at which time appellants' counsel could question him regarding the witnesses' oral statements. On the evening before the last day of trial, appellants' counsel interviewed Trooper Bey at some length and Bey informed them of the existence of notes he made of his interviews with the witnesses. The notes revealed certain discrepancies between the witnesses' testimony at trial and their interviews with Bey, principally regarding the time of the incident at Diamond Park.[8]

■ Where the Commonwealth has in its possession pretrial statements of its witnesses which have been reduced to writing and relate to the witnesses' testimony, it must, if requested, furnish copies of those statements to the defense at the close of each witness's direct examination. *Commonwealth v. Smith*, 417 Pa. 321, 208 A.2d 219 (1965) (written statement); *Commonwealth v. Kontos*, 442 Pa. 343, 276 A.2d 830 (1971) (same); *Commonwealth v. Morris*, 444 Pa. 364, 281 A.2d 851 (1971) (police officer's verbatim notes); *Commonwealth v. Kubacki*, 208 Pa.Super. 523, 224 A.2d 80 (1966) (transcript of tape-recorded interview); *Commonwealth v. Swierczewski*, 215 Pa.Super. 130, 257 A.2d 336 (1969) (portions of police officer's report made from statements of other officers sought for use in cross-examination of the officers with respect to search and arrest of defendants must be disclosed); accord, *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957) (same rule established for federal proceedings).

■ At trial, the Commonwealth apparently believed that Trooper Bey's notes of the witnesses' oral statements did not fall within the *Smith* rule. We need not decide whether this belief was mistaken, for appellants were in no way prejudiced by the Commonwealth's failure to produce the notes when first requested. The notes were supplied to appel-

8. Mack and McClure both testified that the Diamond Park incident had occurred shortly after 9:00 P.M., whereas their statements to Trooper Bey had indicated that it occurred at about 4:30 P.M.

lants' counsel before the end of trial. Appellants, if they desired, were able to present to the jury any discrepancies between the notes and the earlier witness trial testimony during their cross-examination of Trooper Bey. Moreover, the record reveals that appellants were free to recall Mack, McClure and Wynn for further cross-examination based on the information disclosed in the notes, but chose not to do so. Appellants' claim that they were prejudiced by the Commonwealth's failure to produce the notes when first requested, in these circumstances, is specious.

Appellants claim the court erred in denying their request that it conduct an in camera inspection of the police investigatory file. Before cross-examination of the final witness for the Commonwealth, appellants moved for disclosure of all exculpatory material in the possession of the Commonwealth as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The prosecutor responded that all such exculpatory material had already been furnished. Appellants then moved that the entire investigatory file be produced for inspection by the court. This motion was denied.

A defendant is entitled to a court inspection of the Commonwealth's investigatory files only when there exists at least some reason to believe the inspection would lead to the discovery of evidence helpful to the defense. See *Commonwealth v. Royster*, 472 Pa. 581, 372 A.2d 1194 (1977) (plurality opinion). Here, appellants made no showing that the court's inspection would reveal evidence helpful to the defense. The court's denial of appellants' request was proper. See *United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976).[9]

**9.** In Pfaff's brief, it is argued that "During trial it was discovered that the deceased might have been using marijuana, that one or two of the witnesses had been threatened, that several of the prosecution witnesses had been less than candid about their activities the night of the killing, and many more might have been discovered had counsel been permitted to see the police report." We fail to see any connection between the possibility that the decedent might have smoked marijuana and the likelihood that the file might contain undisclosed

■ The last objection urged by both appellants is that they were prejudiced by exhibits bearing police evidence tags marked "Matthews Murder Case" which were permitted to be taken out with the jury. No objection was interposed when the exhibits were introduced, but appellants did object to allowing these tags to go out with the jury. Although it would have been better practice to delete these words from the tags before the exhibits were admitted, the jury had already seen the tags when the exhibits were introduced and they were surely well aware that the case involved a charge of murder. Consequently, we find no error in the trial court's refusal to alter the evidence tags when the jury retired to deliberate.

### III

Appellant Gartner claims that the trial was tainted by prejudicial pre-trial publicity, that opinion testimony was admitted without establishment of the witness's qualifications as an expert, that the jury was erroneously instructed in several particulars, and that the trial court coerced the jury to return a verdict. We find no merit in these contentions.

■ Several of these claims have been waived. Appellant never sought any relief from the trial court to minimize or eliminate any prejudicial effect from pre-trial publicity. Indeed, appellant opposed the change of venue sought by his co-defendant Pfaff. Similarly, when the Commonwealth began to develop the expert's credentials, Pfaff offered to stipulate to his expertise. The Commonwealth then proceeded to examine the witness without further effort to establish his qualifications as an expert. Appellant Gartner failed to object at trial to this examination, raising the issue for the first time on post-verdict motions.

exculpatory evidence. Nor, in light of the fact that only a few persons, all of them known to appellants, had knowledge of the events surrounding the killing, do we find that some of the Commonwealth's witnesses had been threatened indicates any likelihood that the investigatory file would contain exculpatory evidence. All that remains is counsel's bald speculation that such might be the case.

Consequently, these claims may not be raised on appeal. *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974); *Commonwealth v. Johnson,* 457 Pa. 554, 559 n. 5, 327 A.2d 632, 635 n. 5 (1974); *Commonwealth v. Agie,* 449 Pa. 187, 296 A.2d 741 (1972).

 Appellant presents three claims of error in the court's charge: (1) refusal to charge that intoxication could negate the mental state required for aggravated assault, (2) failure to charge specifically that prior inconsistent statements by the Commonwealth's witnesses might be considered to impeach the credibility of those witnesses, and (3) failure properly to instruct the jury on reasonable doubt. Appellant did not object at trial to the failure to charge on intoxication. Rule 1119(b) of the Pennsylvania Rules of Criminal Procedure provides, "No portions of the charge nor omissions therefrom may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate." Consequently, this assignment of error may not be considered on appeal. *Commonwealth v. Clair,* supra; *Commonwealth v. Johnson,* supra.

 Appellant next argues that the trial court failed to charge the jury specifically that prior inconsistent statements of the witnesses might be considered to impeach their credibility. However, the court did charge as follows:

"[Y]ou are the sole judges of the credibility of witnesses. . . . [W]e have found no better way to get to the truth than to take twelve people . . . and put them in the calm atmosphere of a courtroom and listen to witnesses testify . . . and then apply . . . their knowledge of human nature and human beings to determine whether that witness is telling the truth, is telling a falsehood or perhaps a little of either. . . . *So it is for you to consider these things:*

". . . *Statements made at a prior time.*" (emphasis supplied)

We believe that the jury would clearly understand from this charge that prior inconsistent statements might be con-

528

sidered to impeach the credibility of the witnesses. Reading the charges as a whole, as we must, *Commonwealth v. Rodgers,* 459 Pa. 129, 327 A.2d 118 (1974), we find no error in the court's denial of appellant's requested point.

■ The last of appellant's contentions relating to the jury instructions concerns the charge on what constitutes a reasonable doubt. The pertinent portion of the charge was:

"Now although the Commonwealth has this heavy burden of proving that the defendant is guilty, this does not mean that the Commonwealth must prove its case beyond all doubt and to a mathematical certainty or must the Commonwealth demonstrate the complete impossibility of innocence. A reasonable doubt is one that would arise and cause a reasonably careful and sensitive person such as yourself to hesitate before acting upon a matter of importance in your own affairs."

Appellant contends that the last sentence should have referred to "a matter of *the highest* importance." However, we have specifically approved charges in virtually the exact words used by the trial court here. E. g., *Commonwealth v. Young,* 456 Pa. 102, 317 A.2d 258 (1974); *Commonwealth v. Donough,* 377 Pa. 46, 51, 103 A.2d 694, 697 (1954).

■ Appellant's final contention is that the court improperly exerted pressure on the jury to reach a verdict. Jury selection began on Monday, February 11, 1974. The jury was sworn on February 13 and heard evidence on that day and the two succeeding days. The jurors were not sequestered during trial and were free during the weekend of February 16–17. On February 18, the jury heard closing argument and retired to deliberate at 2:55 P.M. At 5:15 P.M., the jury returned to receive additional instructions they had requested. At this time the jurors were informed that the tipstaffs would arrange to take them to dinner whenever they wished. At 12:20 A.M., on February 19, the trial court recalled the jury to the courtroom and addressed them:

"Well, members of the jury, I don't know how you stand and I don't want to know how you stand. But let me say

that you should not be upset or angry at yourself or at each other because you have not promptly reached a verdict. You are, of course, not the first jury that has taken a length of time to reach a decision, so don't let that bother you.

"Let me say a few other things to you; that if you don't reach a decision in this case, the case will have to be tried over again at the next Term of Court. And this, of course, would entail inconvenience for the Commonwealth and the defendants, some modest added expense to the County. But more important than that, I have no reason to believe that if we spent another two or two and a half days picking another twelve people that we would find twelve that were any better or any better able to hear the testimony and analyze it and reach a verdict than the twelve we have right now."

The court then urged the jury, along the lines recommended by the ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Trial by Jury § 5.4(a) (Approved Draft, 1968),[10] to attempt to reach a

**10.** That section reads:

"Length of deliberations; deadlocked jury.

(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

(i) that in order to return a verdict, each juror must agree thereto;

(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(iv) that in the course of deliberation, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

(v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict."

This Court has specifically approved the guidelines set out in this section in *Commonwealth v. Spencer,* 442 Pa. 328, 337, 275 A.2d 299, 304 (1971), and *Commonwealth v. Lambert,* 450 Pa. 130, 133, 299 A.2d 240, 241 (1973), for use in cases involving deadlocked juries. As we said in *Lambert* :

verdict and addressed the problem created by the lateness of the hour:

"Mr. Foreman, I'm going to ask that this jury continue deliberations, but I'll give you and the jurors the option. We do have some reasonably comfortable cots and sheets and blankets and pillows up there. And while it's not like the Hilton Hotel, still we can set up some cots in one section for the ladies and in the three jury rooms for the men or however the tipstaff wishes to conveniently arrange it so that you can get some rest if you so desire. And you have the Court's permission, Mr. Foreman, with the consent of the other jurors, to cease your deliberations at any time that you desire and rest and bed down in the best comfort we can give you under our limited circumstances here for the night, and have a breakfast in the morning as guests of the County and start your deliberations at whatever time you find convenient in the morning.

"Now to emphasize again, I leave that entirely to your discretion as to whether you wish to continue your deliberations this evening or whether you wish to break off your deliberations, remaining together, however, and if telephone calls are necessary to your homes, the tipstaffs will take care of that for you to send any messages you need. If you need to talk personally with some member of the family, you may do so, but of course, we must have a tipstaff with you and the caution is that you may not tell them anything about the case or how you stand or anything. But if there are personal messages that must be conveyed and instructions given as to what has to be done in your absence, we will permit you to make those calls in the presence of a tipstaff."

"The appellant's contention that the charge given in the instant case had the same coercive impact as the now discredited *Allen* charge, see *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), is meritless. Whereas the *Allen* charge specifically directed minority jurors to listen with deference to the majority position, the charge set out in Section 5.4(a) of the Minimum Standards and given in this case charges that *all* jurors 'have a duty to consult with one another . . . .' "
450 Pa. at 133, 299 A.2d at 241–42.

The foreman of the jury indicated that the jurors would prefer to continue deliberating and the jury again retired to deliberate at 12:30 A.M. At 2:55 A.M., the jury returned with its verdict.

Appellant contends that the court's instructions, combined with the failure to secure adequate hotel or motel facilities for the jury were coercive, especially in light of the jurors' lack of sleepwear, toiletries, and fresh clothing. We find no basis for concluding that the verdict was a product of coercion.

■ The court could properly draw the jurors' attention to their duty to "consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment." *Id.* § 5.4(a)(ii); see note 9 supra. In this context, it was not reversible error to refer briefly to the inconvenience of a retrial which would be necessitated by failure to obtain a verdict.

Although the facilities available overnight to the jurors were not luxurious, it appears they were adequate, especially in view of the unexpected length of the deliberations. The court offered the jurors the opportunity to suspend their deliberations in order to rest for the night, but they apparently preferred to attempt a speedy resolution of the case.

We conclude that this situation falls within the rule that " '[t]he length of the deliberation of a jury is wisely left to the sound discretion of the trial Judge, and we reverse only if we find . . . abuse of discretion, or that the verdict was the product of coercion or of an overworked and fatigued jury.' " *Commonwealth v. Ford,* 451 Pa. 81, 85, 301 A.2d 856, 858 (1973), quoting *Commonwealth v. Campbell,* 445 Pa. 488, 495–96, 284 A.2d 798, 801 (1971); *Commonwealth v. Clark,* 404 Pa. 143, 146, 170 A.2d 847, 848 (1961). We cannot make such a finding here.

Judgment of sentence of appellant Gartner for murder of the second degree reversed and a new trial granted. Judgment of sentence of appellant Gartner for aggravated assault vacated and remanded for resentencing.

Judgments of sentence of appellant Pfaff for murder of the second degree and aggravated assault affirmed.

JONES, former C. J., did not participate in the decision of this case.

POMEROY, J., filed a concurring opinion.

NIX, J., filed a concurring and dissenting opinion.

EAGEN, C. J., would also affirm the judgment of sentence imposed on Gartner's murder conviction.

POMEROY, Justice, concurring.

I concur in the reversal of the judgment of sentence for murder at No. 29,[1] but cannot join in the Court's opinion, which decides a question it need not consider.

Appellant Gartner contends that he was entitled to a charge on involuntary manslaughter in this murder prosecution. For the reasons expressed in *Commonwealth v. Polimeni*, 474 Pa. 430, ——, 378 A.2d 1189, 1196 (1977) (opinion of Pomeroy, J., joined by Eagen, C. J., announcing the decision of the Court), the question of whether a defendant on trial for murder has a right to such a charge regardless of the evidence is one I would leave for a case where a decision is necessary. Here, as in *Polimeni, supra, Commonwealth v. Garcia*, 474 Pa. 449, 378 A.2d 1199 (1977), and *Commonwealth v. Ford*, 474 Pa. 480, 378 A.2d 1215 (1977), there is no need to decide that question, and I express no view on it. It is sufficient to observe that there was evidence from which the jury could rationally conclude that the appropriate conviction, if any, in this case would be for involuntary manslaughter.[2] Because the charge to the jury precluded that

1. In the appeal from the judgment of sentence for murder at No. 30, I join in the disposition expressed in Part I(B) of the opinion of Mr. Justice ROBERTS.

2. The Commonwealth's evidence indicated that Gartner fired the fatal shot from a distance of 147 feet while attempting to shoot out the tires of a car operated by Otis Mack, and the jury could have found that the killing of Marlon Matthews was accidental, although the result of criminal negligence. *See* 18 Pa.C.S. § 2504 (1973).

verdict, I agree that there must be a new trial on the murder indictment.

NIX, Justice, concurring and dissenting.

In reaching the conclusion that appellant Gartner's conviction of murder must be reversed, the majority repeats the reasoning it relied upon in *Commonwealth v. Garcia,* 474 Pa. 449, 378 A.2d 1199 (filed October 7, 1977). I am thus constrained to again express my disagreement. I do not believe that the majority's rationale is either required or authorized under the Crimes Code.[1] *See Commonwealth v. Garcia, supra* (Nix, J., dissenting opinion).

The majority, through judicial fiat, has ignored the expressed legislatively defined degrees of homicide and vested in the jury the power of "mercy dispensing" which permits it to determine the degree of homicide based upon unspecified imponderables which they alone may deem to be significant. Not only does this approach invite arbitrary action by juries, it also leaves a reviewing court powerless to ascertain and to remedy discriminatory verdicts.[2] I must emphatically dissent not only because the majority has engaged in the most flagrant kind of judicial legislation but also because the end product is jurisprudentially unsound.

The term "mercy dispensing power" is merely an euphemism to justify a rationally unsupportable verdict. This is also true where a "lesser included offense" rationale is employed in a factual context where a finding of the lesser charge cannot possibly be justified.[3]

---

1. 18 Pa.C.S.A. §§ 101 et seq. (1973).

2. In this jurisdiction it is not the practice to require juries in criminal cases to return special verdicts.

3. It is my general view that the decision as to which degree of homicide to charge is and should be a matter of prosecutorial discretion, and the exercise of that discretion should not be frustrated by this Court's imposition of unwarranted jury instruction requirements. This general view is subject only to the qualification that where there exists a factual dispute as to an element of the greater offense, which element is *not* within the lesser offense, then and only then should there be a right to an instruction on the lesser

The only explanation for the majority's willingness to permit such an erosion in the adjudicative process is the unwarranted fear that a lay fact-finder is likely not to possess the intestinal fortitude to return a verdict dictated by the evidence.[4] As I have stated, I do not share such a dim view of my fellow citizens. *Commonwealth v. Garcia, supra* (Nix, J., dissenting opinion). Even if such a fear is supportable, it is ironic that the majority's response is to throw out verdicts rendered by juries that did have such fortitude.

I have considered all of the arguments of appellant and I find them to be devoid of merit. Under my view there is no need to remand the cause to the trial court but rather the judgment of sentence should be affirmed.

As to appellant Pfaff's conviction, I concur with the majority's affirmance of judgment of sentence.

offense. Thus if the greater offense is comprised of elements A, B, and C and the lesser of elements B and C, a factual dispute going to element A would give rise to the right to an instruction on the lesser offense. I adopt this qualification, because the United States Supreme Court has suggested that the failure to so instruct in such a case might present serious constitutional questions. *See Keeble v. United States,* 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973). It should be noted that this approach is not equivalent to the "rational basis" approach. Under this latter approach, a jury instruction on the lesser offense would be required whenever there was evidence going to elements B and C, regardless of whether element A was factually in dispute.

4. I am eagerly awaiting the majority's development of this concept to ascertain whether a judge, in a bench trial or on a plea of guilt, will be given a similar power (i. e., a mercy-dispensing power). If this power is not given to the judge where he undertakes the role of the fact-finder, then the constitutional problems would abound. If he is conferred with the same power, then the legislatively defined grades of homicide will be rendered meaningless.