433 A.2d 499

**COMMONWEALTH of Pennsylvania,**

v.

**Allen FREEMAN, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 11, 1980.

Filed Aug. 7, 1981.

Petition for Allowance of Appeal Denied Nov. 9, 1981.

P. Andrew Diamond, Pittsburgh, for appellant.

Robert L. Eberhardt, Deputy District Attorney, Pittsburgh, for Commonwealth, appellee.

Before PRICE, CAVANAUGH and HOFFMAN, JJ.

CAVANAUGH, Judge:

In this homicide case, appellant, Allen Freeman, was charged with murder in the first and third degree and violation of the Uniform Firearms Act. Following a jury trial before Popovich, J. (now a judge of this Court) and a jury he was found guilty of involuntary manslaughter and carrying a firearm without a license. Appellant's motions for a new trial and in arrest of judgment were denied and he was sentenced to six months to two years less one day imprisonment for involuntary manslaughter and five years probation and payment of court costs for the firearms

offense. Appellant has appealed to this court from the judgment of sentence.

Ironically, the appellant, a man of approximately seventy years of age, was acting as a good citizen at the beginning of the events which ultimately resulted in the charges against him. At about five p.m. on December 2, 1978, appellant went to the police station in Duquesne, Pennsylvania, to report to the police that Washie Williams was at the Mill Gate Tavern displaying a weapon. Officer Legin immediately went to the tavern to confront Mr. Williams with the information he received from the appellant. Williams denied having a weapon and the officer directed him to step outside the tavern. The officer told Williams that "it appears you have been drinking, you're pretty happy . . . take it easy." Williams told the officer, "hey, Legin, you know me, I'm cool. I'm cool." Since no weapons were observed on Williams the officer left the scene without taking any further action and Mr. Williams went back inside the tavern.

Unfortunately for both appellant and Mr. Williams, appellant did not go to his home or to some other place after reporting to the police that he had observed a weapon on Mr. Williams, but instead he returned to the tavern. Williams immediately confronted the appellant upon his return to the tavern and was very angry at his having reported to the police that he had a weapon. Williams denied that this was the case and to prove this point he removed his coat. During the argument between Mr. Williams and appellant, Williams told the appellant that he would kill him before the day was finished. Appellant testified that "he came back toward me with his fists like this, 'old man, I'm going to kill you now.'" Appellant testified he was scared at this point. He did not know if Williams still had the gun which he had observed at an earlier time in the day. He further testified that he thought Williams "would probably have broken my neck." The appellant drew a .32 caliber revolver from his pocket and fired two shots at Mr. Williams. Both shots found their mark and Mr. Williams died shortly afterwards as a result of his wounds. The appellant left the tavern

before the police arrived. He was arrested a short time later standing in front of the Duquesne Police Station where the drama had commenced not long before.

Appellant's first contention on appeal is that he was prejudiced by prosecutorial misconduct involving the concealment by the police of evidence of a weapon in the possession of Mr. Williams immediately prior to his being shot by the appellant. The facts do not support this contention. A witness for the Commonwealth, James Jeffries, testified that on the day of the shooting he observed Mr. Williams with a gun on his person. The witness testified that the gun was under Williams' jacket and the witness observed the gun about fifteen minutes before he saw the appellant arrive at the tavern. He heard Williams and appellant argue about the fact that someone had gone to the police and reported that Williams had a gun on his person. At the time of the argument Williams no longer had a gun, and to prove it to appellant, according to Jeffries, Williams pulled his jacket back on both sides. Another witness for the prosecution, Lavelle Miller, testified that he saw Williams remove his jacket during the argument with appellant "and showed he didn't have no [sic] pistol on him." At that point, according to Mr. Miller the appellant fired two shots at Williams.

On the morning of the third day of trial the assistant district attorney told the court that the police had located a Mr. Manor Agopoff who was in the tavern at the time of the shooting. Mr. Agopoff had made his statement to the police the night before the district attorney told the court about the witness. The trial court permitted Mr. Agopoff's testimony over objection of defense counsel. Mr. Agopoff testified that he had been in the tavern about an hour before the fatal shots were fired by the appellant. He heard the argument between appellant and Mr. Williams. During the course of the argument Mr. Agopoff observed Mr. Williams leave for the men's room. As he was returning he touched Agopoff's coat pocket and Agopoff believed that this was merely a gesture of greeting. At that time he did not know

that Williams had placed a gun inside the pocket of his heavy jacket. When the shooting occurred he quickly jumped off the bar stool to seek cover and he was then surprised to find a gun and holster had been placed in his pocket. Mr. Agopoff was frightened by this development and not wanting to get involved he did not tell the police about finding the gun and in fact threw it over an embankment. It was not until the day before he testified in court that he told the police what had occurred.[1] Appellant contends that the police were engaged in misconduct by concealing evidence or by improperly investigating the crime. Suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment, irrespective of the good or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Commonwealth did not suppress Mr. Agopoff's testimony as he did not tell the police about throwing away the gun until the day before he testified in court. The assistant district

1. Concerning the gun, Mr. Agopoff testified:
   Q. Was the gun in a holster, you said?
   A. Yes, it was.
   Q. What did you do with it?
   Well, after the police came and everything, we all left, I went—at one time, while they were waiting for the police, I got sick, threw up, came back in, I didn't want to run away, but because there was nothing to run away from, really, then, after the police came, they started to talk to people, everybody started to disappear, so I immediately went home and I sat down and I started to think, here I am sitting here with a pistol. I'm involved in something that I didn't know what was going on, so I rode around and I walked up where I work, it is on the river bank, and I threw the gun—attempted to throw the gun over the hill into the river. Where it landed, I have no idea. I went back home, and after setting around, twice I got up through the night, which I couldn't sleep anyway, and I attempted to go to the police station, I live a half block away from the station, I rode by there real slow, I just couldn't bring myself to go there and, you know, tell my part. I just didn't know what to do.
   Q. Mr. Agopoff, when was it you came forward with this information that you just testified to?
   A. Yesterday.
   Q. Prior to yesterday, were you ever contacted by the police in regard to this particular shooting?
   A. No, I wasn't contacted by the police or anyone.

attorney notified the court shortly after court opened on the following day. Prosecutorial misconduct, if any, would be limited to the failure of the police to earlier locate Mr. Agopoff. Appellant has not cited any Pennsylvania cases, nor has our research revealed any, that discuss how far the police must go in locating a witness or other evidence favorable to a criminal defendant. By analogy, the Supreme Court has dealt with the issue of the required diligence of police in locating a defendant under Pa. R. Crim. P. 1100, which excludes delay resulting from the unavailability of the defendant. The court stated in *Commonwealth v. Mitchell*, 472 Pa. 553, 556, 372 A.2d 826, 832 (1977).

It is not the function of our courts to second-guess the methods used by police to locate accused persons. The analysis to be employed is whether, considering the information available to the police, they have acted with diligence in attempting to locate the accused. Deference must be afforded the police officer's judgment as to which avenues of approach will be fruitful.

As pointed out in *Commonwealth v. Jones*, 256 Pa.Super. 366, 373, 389 A.2d 1167, 1170 (1978), again in dealing with efforts to locate a criminal defendant "[a]lthough the police could have pursued other avenues to locate appellant, that is not the controlling factor. It is simply not required that the Commonwealth exhaust every conceivable method of locating a defendant. Rather, reasonable steps must be taken." *See also Commonwealth v. McDermott*, 280 Pa.Super. 535, 421 A.2d 851 (1980). At trial, the prosecutor stated that when he had talked to his witnesses shortly before trial that a rumor surfaced that the gun Washie Williams had in the tavern before he was shot was "dropped" on Agopoff. The prosecutor told the police to find out where Agopoff lived and he was located the day before he testified at trial. Mr. Agopoff testified that when the police arrived shortly after the shooting "they started to talk to people, everybody started to disappear, so I immediately went home." He was frightened, and didn't want to get involved. As a result he threw the gun away.

■ The appellant has presented no evidence that the police were less than diligent in investigation of the crime or locating evidence. We cannot assume that the deceased's missing weapon could have been located by more thorough police investigation. Nor can we speculate at what point Mr. Agopoff changed his mind and decided to disclose information concerning the missing weapon rather than concealing it.

Appellant argues that Mr. Agopoff's testimony which was beneficial to him came too late in the trial to be of assistance. We disagree. To begin with, James Jeffries testified for the prosecution that he observed the decedent in the tavern and that he had a gun on his person, although at the time of the shooting he was not armed. Two other prosecution witnesses also testified that Williams removed his jacket during the argument and they observed no gun. Further, after the testimony by Mr. Agopoff the trial court offered to have the Commonwealth reopen its case and have its witnesses subjected to cross-examination. Appellant refused this offer. In *Commonwealth v. Gartner*, 475 Pa. 512, 381 A.2d 114 (1977) the prosecution had a state police officer's notes of oral statements of witnesses in its possession which it did not disclose to the defendants notwithstanding their timely request for production of statements. The notes were supplied to defendant's counsel before the end of the trial. The Supreme Court stated at 475 Pa. 524, 525, 381 A.2d 120:

> The notes were supplied to appellants' counsel before the end of trial. Appellants if they desired, were able to present to the jury any discrepancies between the notes and the earlier witness trial testimony during their cross-examination of Trooper Bey. Moreover, the record reveals that appellants were free to recall Mark, McClure and Wynn for further cross-examination based on the information disclosed on the notes, but chose not to do so. Appellants' claim that they were prejudiced by the Commonwealth's failure to produce the notes when first requested, in these circumstances, is specious.

*See also Commonwealth v. Dolny,* 235 Pa.Super. 241, 342 A.2d 399 (1975) which found no prejudice to a defendant who was not permitted to view written material available before trial, although during trial he was shown the material in the judge's chambers. The court stated at 235 Pa.Super. 241, 251–252, 342 A.2d 404:

> Appellant's counsel had the information available for purposes of cross-examination. Moreover, after he reviewed the material, he was given the opportunity to recall any witness he chose, so that he could elicit further testimony on cross-examination. The trial judge afforded counsel every opportunity to utilize the information acquired through the Crimes Commission Records. Appellant cannot claim prejudice as a result of the procedures employed by the lower court.

■ Appellant must establish that he was prejudiced by the failure of the Commonwealth to produce Mr. Agopoff prior to trial. No prejudice has been shown and the trial court gave appellant ample opportunity to make whatever use he wanted of Agopoff's testimony.

In this case we do not find any prosecutorial misconduct. The district attorney called Mr. Agopoff as a witness the day after Agopoff told the police about Williams' gun being placed in his pocket and his subsequent disposal of the gun because of his fear of becoming involved. Appellant states in his brief "it is evident that Agopoff's identity and his participation in the concealment of evidence was known by Chief Cmar [of the Duquesne Police Department] sometime prior to trial." The record does not support this statement. Appellant relies on *Commonwealth v. Jenkins,* 476 Pa. 467, 383 A.2d 195 (1978) to support his contention that prosecutorial misconduct in withholding information favorable to the defendant may be the basis of a new trial. In the *Jenkins* case the prosecutor used a written report prepared by a police officer to impeach the defendant's credibility after the prosecution had previously denied the existence of such a report. The prosecutor had possession of the report at all relevant times and failed to turn it over to the defense

notwithstanding an order of the court to turn over all such statements to the defense. The assistant district attorney handling the case repeatedly assured the court and defense counsel that no such report existed. Our Supreme Court found that the prosecution's withholding the statement and subsequently using it to impeach the defendant required the grant of a new trial "because the non-disclosure affected the fairness of the trial." The Court held that the prosecutor's use of the reports undeniably affected the defendant's credibility. The facts in the *Jenkins* case are readily distinguishable from those in the instant appeal. We find that the appellant was not prejudiced by the testimony of Mr. Agopoff nor was he denied a fair trial.

■ Appellant also contends that the court below committed reversible error in permitting the Commonwealth's ballistics expert to testify to matters not contained in the written report submitted to the appellant prior to trial. On appeal, appellant does not contend that Dr. Levine, the ballistics expert who testified at trial, was not qualified or that expert testimony was not admissible, but limits his objection to the extent of the expert testimony. Dr. Levine's pre-trial report stated that he had conducted various test firings on the weapon involved. From the tests conducted it was his expert opinion that the weapon which killed Mr. Williams had been fired from a short distance. Appellant does not object to this testimony on appeal but objects to the expert's testimony that the weapon used in the homicide had a trigger weight of sixteen pounds. Appellant contends that since this did not appear on the pre-trial report it was reversible error to allow the expert to so testify at trial. The witness described the various tests he performed on the weapon including firing the weapon and microscopic examinations. With respect to the trigger pressure Dr. Levine testified as follows:

Q. Did you do any tests concerning how much pressure was needed in order to operate that particular handgun at double action?

A. To fire the weapon double action required a weight of sixteen pounds or greater.

Q.  Sixteen pounds or greater?

A.  Yes.

Q.  For guns of this type is that the normal amount of pressure that is needed?

A.  For this manufacturer [sic] of weapon, it is not unusual to have something that heavy, sixteen pounds, to fire double action.  The normal range for better manufactured weapons are [sic] anywhere from nine and a half to thirteen and fourteen pounds.

The fact that Dr. Levine did not mention this specific test in his report does not make it inadmissible.  Further, appellant was not prejudiced by the testimony.  Appellant contends that his defense of self-defense was damaged by the testimony.  We do not agree.  The fact that the weapon used by appellant was apparently more difficult to fire than a more expensive and better manufactured weapon does not in any way diminish the defense of self-defense.  Although Dr. Levine testified that appellant's weapon was probably one of the least expensive guns made, this, coupled with the requirement of sixteen pounds pressure to pull the trigger, did not impede appellant's defense.

Judgment of sentence affirmed.