J-S37019-25

2026 PA Super 96

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| KHALILH JAFAR EVANS | : | |
| Appellant | : | No. 36 EDA 2025 |

Appeal from the Judgment of Sentence Entered July 10, 2024
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0004819-2023

BEFORE: DUBOW, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED MAY 12, 2026**

Appellant, Khalilh Jafar Evans, appeals from the judgment of sentence entered in the Court of Common Pleas of Montgomery County after a jury convicted him of false imprisonment of a minor.[1] Sentenced to serve a three-and-one-half to ten years' incarceration and to register as a Tier I sex offender pursuant to the Sexual Offender Registration and Notification Act ("SORNA"),[2] he raises challenges to the trial court's jury instructions, *ex parte* questioning of a juror and eventual replacement of the juror, and to the sufficiency of the evidence offered to prove the charge of false imprisonment. We affirm.

At Appellant's criminal trial, the Commonwealth presented the testimony of the 14 year-old girl who encountered 45-year-old Appellant at

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2903(b).
[2] 42 Pa.C.S.A. § 9799.15.

the Willow Grove Mall, and it supported her testimony with both the shopping mall's security video and the girl's contemporaneous cell phone recording via a Snapchat app. Specifically, on July 12, 2023, at approximately 7:00 p.m., the girl was shopping with three of her friends on the second floor of the Willow Grove Mall when she became "a little upset" with one of them and decided to walk alone to a jewelry store located on the first floor.  N.T. (trial), 4/17/24, at 51-52.  She boarded the down escalator while listening to music on her earphones and looking at her phone, when she happened to notice an unfamiliar adult man about ten steps ahead of her was talking to her and waving for her to come to him.  N.T. at 53; *See* Commonwealth's Ex. 5 at 00:20.

The man summoning her was Appellant, and he was accompanied by another man.  The girl did not move toward Appellant.  The two men dismounted the escalator, but only Appellant waited for her, while the other man walked slowly ahead.  *See* Commonwealth Ex. 5 at 00:38.  When the girl reached the bottom of the escalator, Appellant offered his arm and told her to walk with him.  N.T. at 54.

The mall security video shows the girl walking around him and looking back.  *See* Commonwealth's Ex. 5 at 00:46.  The jewelry store she was interested in was behind her, but she continued to walk straight ahead and Appellant stayed alongside her.  *See* Commonwealth's Ex. 6 at 00:25-31.  When asked why she walked that way rather than turning towards the jewelry

store, she answered, "because I couldn't get away from him, and that's where he was walking." N.T. at 67.

In her testimony, the girl denied voluntarily taking his arm, N.T. at 55, asserting instead that Appellant "grabbed my wrist, and he put it inside his arm" and "pressed down" to prevent her from withdrawing it. N.T. at 55. **See** Commonwealth's Ex. 6 at 00:32-33. She testified that she asked why she needed to walk with him, and Appellant replied during the walk that she needed to know who he was, that his name was Alex, and he was 25 years old. N.T. at 55-56. She told him she was 13 years old, one year younger than her actual age, to emphasize to him that she was a minor. N.T. at 56.

She testified that she was fearful during this walk, which prompted her to record secretly the event on her cell phone, which, she explained, "was already on Snapchat, so I just had my phone, like, by my leg, and I was just recording him." N.T. at 56. The Commonwealth introduced the video into evidence and played it for the jury. N.T. at 57-58, 65. Three photographs, or "still shots," were taken from the video and admitted into evidence after the girl authenticated these, as well. N.T. at 58-59. She stopped recording when Appellant suggested he put his phone number in her phone and she put her number in his. N.T. at 66. She testified, however, that phone numbers were not exchanged. N.T. at 66.

She asserted that Appellant's grip was so tight that she either could not remove herself from it or, when she tried to pull free, he would resecure it. N.T. at 67-68. He loosened his grip after he said he was 25. N.T. at 68. She

pulled away as fast as she could and said she was 13 years old. N.T. at 68. This did not dissuade Appellant, according to the girl, as she testified Appellant "asked if he was too old for [her]," and he "kept coming towards me and kept trying to get me to go with him. . . . He kept, like, putting his arm towards me and kind of trying to get me to, like, hold his arm again." N.T. at 68; See Commonwealth's Ex. 7 at 00:49.

She took several steps back, yelled at him, and began to walk away. N.T. at 68-69; Commonwealth Ex. 7 at 00:50-55. She testified that at that moment, "after I yelled, I kind of just started walking away in, like, shock, and then I started, like, running. N.T. at 69; Commonwealth Ex. 7 at 1:07-17. She acknowledged there were other people around, including a woman who "came up to me and asked if I needed help, [but] I just kind of ran." N.T. at 69.

The girl phoned a friend and regrouped with her and the others, who advised her to report her encounter to mall security. N.T. at 69-73. She spoke with both a security guard and a supervisor and showed them her video, but they did not contact police. N.T. at 73. The security guard escorted the girl and her friends to the mall exit, and they walked across the street to Panera Bread and waited there for about one hour until the girl's father picked them up. She returned home, where a uniformed police officer from the Abington Police Department visited her home and conducted an interview of her and watched the video recording on her phone. N.T. at 78-79. A second

- 4 -

officer with the Abington Police Department drove them down to the Abington police station, where the girl provided a statement. N.T. at 79.

Police arrested Appellant and charged him with False Imprisonment of a Minor and two counts of Harassment. The trial court provides an apt recitation of the ensuing relevant procedural history, as follows:

> From April 17 through April 18, 2024, the [trial court] held a jury trial. During the course of deliberations, the court discharged a juror[fn] after it determined that the juror was refusing to perform her duties with respect to deliberations. Following the replacement of the discharged juror with one of the alternate jurors, the jury found Appellant guilty of the charge referenced above.
>
> ---
>
> > Fn. This specific juror was designated as Juror Number 8 following *voir dire*.
>
> ---
>
> On July 7, 2024, Appellant filed a Motion for Arrest of Judgment asserting that the [trial] court's discharge of the juror on the grounds she was refusing to deliberate constituted an abuse of discretion. On July 10, 2024, the court denied Appellant's motion.
>
> On that same date, the [trial] court imposed an aggravated range sentence of forty-two (42) to one-hundred twenty (120) months of imprisonment (three and one-half (3 ½) to ten (10) years). The court also ordered Appellant to register as a Tier I offender under 42 Pa.C.S.A. § 9799.14 of Subchapter H of the Sex Offender Registration and Notification Act ("SORNA"). Pursuant to 42 Pa.C.S.A. § 9799.15 of SORNA, Appellant's classification as a Tier I offender required him to register as a sex offender for fifteen (15) years and to comply with all of the requirements associated with this registration. On July 18, 2024, Appellant filed timely post-sentence motions.
>
> On December 3, 2024, Appellant filed a timely notice of appeal. On December 4, 2024, the [trial] court issued an Order directing Appellant to file a concise statement of matters complained of on

appeal pursuant to Pa.R.A.P. 1925(b) (the "Concise Statement") within twenty-one days (21) days. On December 19, 2024, Appellant filed a timely Concise Statement. In his Concise Statement he raises the following four issues:

1. Did the [trial] lower court err in removing Juror No.8 where the court's colloquy of the juror failed to establish whether the juror's wish to, "no longer discuss the aspects of the case" was indicative of the juror's refusal to surrender an honest belief as to the weight or effect of the evidence as opposed to an outright refusal to deliberate?

2. Did the trial court err in questioning Juror No.8, regarding her desire to, "no longer discuss the aspects of the case" without defendant or defense counsel present?

3. Did the [trial] court err in defining [in its jury instruction], "interfere substantially with [the complainant's] liberty/freedom" as follows,

   "In determining the magnitude of restraint necessary for false imprisonment, the appellate court has recognized that false imprisonment covers restraints which are less serious than those necessary for the offenses of kidnapping and unlawful restraint.

   In determining whether the restraint at issue interfered with another individual's liberty 'substantially' the appellate court directs the jury to give the word "substantially" it's plain meaning.

   Thus, false imprisonment covers restraints where an individual's liberty is interfered with in an ample or considerable manner."

   (N.T. 4/18/24, pp. 29-30), when the aforesaid definition failed to provide a definition of the offenses of "kidnapping" or "unlawful restraint"[?]

4. Was the evidence insufficient to establish the offense of false imprisonment where the evidence failed to demonstrate that Appellant's actions interfered substantially with the complainant's liberty?

Trial Court Opinion, at 2-4. The Brief of Appellant raises and develops the same four issues for this Court's consideration.

In Appellant's first two issues, he challenges both the trial court's decision to discharge Juror No. 8 during deliberations and the propriety of the court's *ex parte* interview of the juror that culminated with her discharge. In his first issue, he maintains that the brief exchange between the trial court and the juror did not clarify if she had defied the court's charge to consult with fellow jurors and deliberate with a view toward reaching agreement or if, instead, she had obeyed the charge by deliberating for some time before reaching her individual judgment and concluding, only then, that further deliberation would do violence to her decision.

> This Court has observed,
>
> "The decision to discharge a juror is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. This discretion exists even after the jury has been impaneled and the juror sworn." **Commonwealth v. Marrero**, 217 A.3d 888, 890 (Pa. Super. 2019) (citation omitted). Further, "the trial judge, in his sound discretion, may remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty as a juror is impaired." **Id**. (citation omitted).

**Commonwealth v. Ransom**, 328 A.3d 1127, 1139 (Pa. Super. 2024).

Important to the present issue is that the trial court had issued to the jury a **Spencer** charge, also referred to as a "dynamite charge," which is an instruction designed to "blast loose" a deadlocked jury by directing the jury members "to continue to deliberate, with an open mind to reconsideration of

views, without giving up firmly held convictions." **Commonwealth v. Greer**, 951 A.2d 346, 348 (Pa. 2008) (*citing* **Commonwealth v. Spencer**, 275 A.2d 299 (Pa. 1971)). This Court in **Spencer** recognized that, "[d]eadlocked juries are a matter of concern to both the bench and the bar." [**Spencer**,] 275 A.2d at 304. Yet, **Spencer** also emphasized that a conviction will be reversed if it was coerced by the court's charge. **Greer**, 951 A.2d at 354-55 (some citations & quotation marks omitted).

The record shows that 76 minutes after beginning its deliberations, the jury returned to the courtroom [at 10:43 a.m.] asking to rewatch the video and view the photos so it could clarify when Appellant took the girl's arm and held it. N.T. at 25-28. The videos were replayed, and the photos were shown again to the jury. N.T. at 27-28. The jury returned to deliberate at 10:53. a.m.

At around noon, the jury asked the court to define "interfere substantially with [one's] liberty/freedom with a focus on substantially." N.T. at 28. The trial court gave the requested instruction[3] and returned the jury to its deliberations.

_____

[3] For the edification of both the prosecutor and defense counsel, the trial court previewed its proposed answer, which would instruct the jury, first, that the appellate courts direct juries to give the word "substantially" its plain meaning and, second, that false imprisonment includes restraints that are less serious than those necessary for the events of kidnapping and unlawful restraint. Defense counsel, however, objected to the proposed comparison to kidnapping and unlawful restraint, as he did not want "the jury to be thinking
*(Footnote Continued Next Page)*

At 1:09 p.m., the jury notified the trial court that it was "unable to unanimously come to a verdict." N.T. at 30. The trial court summoned the jury to the courtroom and issued a *Spencer* charge, which included the following:

**Trial Court**: All right. The jury foreperson has informed me you are deadlocked. I remind you in order to return a verdict on any charge, you must agree unanimously on that specific charge.

Each of you has a duty to consult one another and to deliberate with a view to reaching an agreement if it can be done without violence to your individual judgment. However, each of you must decide the case for yourself after an impartial consideration of the evidence with your fellow jurors.

While you should not hesitate to reexamine your own views and change your opinion if you are convinced your opinion is erroneous, do not feel compelled to surrender your honest belief as to the weight or effect of the evidence solely because of the opinion of your fellow jurors and for the mere purpose of returning a verdict.

If after further deliberations you are still deadlocked, do not – I'm going to give you a clean verdict sheet. Do not fill out the verdict sheet. Just send me a note.

That's all right. You're fine.

---

about kidnapping or unlawful restraint, two charges that [Appellant] is not facing." N.T. at 29-30. The trial court opined that the instruction would not unduly influence the jury, overruled the defense objection, and eventually gave the instruction as proposed.

> If you do reach a verdict, then fill out the verdict sheet. If you can't reach a verdict, then send me a note.
>
> So, keeping this in mind, I'm going to send you back to make one last effort to see if you can reach a unanimous verdict. All right?

N.T. at 31-32.

At 1:11 p.m., the jury retired for further deliberations. At an unrecorded time of day, but prior to 2:00 p.m. based on subsequent time notations, the trial court reconvened the parties and announced that it received a note from the jury stating, "We are unable to reach a verdict. One juror respectfully but forcefully no longer wishes to discuss the aspects of this case." N.T. at 32-33.

The trial court initially announced, "So, I'm going to declare a mistrial for manifest necessity[,]" and it asked for the Commonwealth's position. N.T at 33. The Commonwealth recommended that if the juror is refusing to deliberate then they should "be struck for cause, and we replace that juror with an alternate, or at least bring that juror in here. If they're not deliberating, they're not doing their job." N.T. at 33.

Defense counsel, however, asked the trial court to declare a mistrial. "Based on the wording as I understand it[, the juror's] refusal to discuss is based on their own conscientious consideration of the evidence. Their conscience cannot be changed based on their position on the case." N.T. at 33. The trial court took a brief recess and returned with a decision to "bring back the one juror—I don't know who it is—and I'll speak with the juror on

the record but without anyone else there, and if she's refusing to – well, let me see. I'll report back and see. All right? The Commonwealth agreed to the trial court's recommendation, but defense counsel noted his objection. N.T. at 34.

The notes of testimony record the *ex parte* meeting in the robing room between the trial court and the holdout juror, Juror No. 8.

**Juror No. 8**: Hi. I feel like I'm in the principal's office.

**Trial Court**: I'm sorry. No, you're not. You're not.

All right. The note came back, "We are unable to reach a verdict. One juror respectfully but forcefully no longer wishes to discuss the aspects of the case."

Are you that juror?

**Juror No. 8**: Um-hmm.

**Trial Court**: I need you to say yes.

**Juror No. 8**: Yes. Sorry.

**Trial Court**: All right. Thank you.

**Juror No. 8**: You're welcome. That's it?

**Trial Court**: That's it.

N.T. at 35.

The trial court reconvened proceedings in open court and informed the parties as follows:

**Trial Court**: I asked – we asked the jury foreperson to identify the juror who forcefully no longer

> wishes to discuss the aspects of the case. It was Juror No. 8.
>
> I met with her and I asked if that was correct, and she said yes, so she's going to be dismissed, and I'm going to replace her with I guess Alternate No. 2 which is Alternate No. 1. I'll bring the jury back and I'll tell them to start their deliberations again.

N.T. at 35.

Defense counsel objected and cited authority holding that a jury's stated inability to reach a unanimous decision after careful consideration must be resolved in favor of the defendant, but the trial court distinguished that holding on the facts, noting in the instant matter the juror in question is "refusing to discuss the case. That's different. She's not sticking to her position. She's refusing to deliberate anymore." N.T. at 36. Defense counsel responded by stating his understanding but noting, also, that he was not privy to the conversation. The trial court recognized the defense objection. N.T. at 36.

At 2:06 p.m., the trial court summoned the jury to the courtroom and announced that Juror No. 8 had confirmed "she would not discuss the case." N.T. at 37. Consequently, the trial court advised it had replaced Juror No. 8 with an alternate juror. The newly-composed jury retired for further deliberations briefly before requesting and being granted another view of the video evidence to allow the alternate juror to view it with them. N.T. at 37-38. Before the end of the day, the jury returned with a verdict of guilty on the count of false imprisonment. N.T. at 41.

After excusing the jury and setting bail conditions, the trial court allowed defense counsel to supplement his earlier objection to the dismissal of Juror No. 8 by reciting an excerpt from the Pennsylvania Supreme Court decision in *Spencer*, reaffirming the principle that a trial court shall not lead a juror with a minority perspective, whether for guilty or not guilty, "to reexamine their position despite the existence of or the lack of a reasonable doubt, whether they're the minority or the majority during deliberations[.]" N.T. at 46. The trial court replied by indicating that *Spencer* is distinguishable because present Juror No. 8 was "not a juror who just doesn't want to change their mind, which that's their right. This is a juror who refused to continue with deliberations. You've preserved your objection." N.T. at 46.

The trial judge was in a unique position to assess Juror No. 8 before removing her for a refusal to follow jury instructions to remain open to deliberations. The record establishes that the jury received the case approximately four hours prior to the *in camera* interview, and Juror No. 8 had settled on her decision for some time before that. When learning that the jury remained deadlocked after receiving additional instructions to deliberate, the trial court first stated it would declare a mistrial but reconsidered after the prosecutor suggested the holdout juror was "not doing her job" if she was disregarding the court's most recent, supplemental instructions to continue to discuss aspects of the case with an open mind to viewpoints before forming a final and unreviewable decision.

Agreeing that a refusal to deliberate would contravene instructions and serve as grounds for dismissal, the trial court announced it would meet with the holdout juror. The trial court interviewed Juror No. 8 *in camera*, where the juror acknowledged that she was respectfully, but forcefully, refusing to discuss or consider the case any further. The trial court deemed her response disqualifying because, in its view, she revealed she had not been amenable to the court's two sets of jury instructions issued in the early hours of deliberation charging the jurors to keep an open mind and consult with their fellow jurors during the deadlock.

Rather than viewing the impasse as a genuine inability to reach verdict that necessitated a mistrial—a position it initially held—the trial court determined Juror No. 8 had disregarded jury instructions to consult her fellow jurors and remain open to deliberating before settling on a decision. Therefore, it replaced her with an alternate juror who would follow instructions. In this respect, the trial court aptly includes in its Pa.R.A.P. 1925(a) opinion citation to caselaw recognizing that a trial judge is in a unique position to make demeanor and credibility determinations about a juror when assessing a juror's fitness for the task at hand, **see** trial court opinion at 5, and it provides a cogent explanation of why its face-to-face interview with Juror No. 8 led it to conclude that replacement of the juror, rather than a declaration of mistrial, represented the appropriate judicial response. Given the record and the trial court's explanation offered in its Rule 1925(a) opinion,

we conclude the trial court acted within its sound discretion, such that we deny Appellant relief on his first claim.

In Appellant's second issue, he contends that the trial court's *ex parte* communication with Juror No. 8 violated his rights to have counsel present at a critical stage where substantive rights are implicated. ***See Commonwealth v. Johnson***, 828 A.2d 1009 (Pa. 2003) (recognizing constitutional right to counsel's presence during critical stage of instructing a jury). He argues, specifically, that because the *ex parte* questioning prevented defense counsel from demanding more probing and extensive questioning of the juror to determine her exact position, Appellant was prejudiced. Brief of Appellant at 29.

The trial court responds by reference to the record, which, it opines, shows that defense counsel failed to offer a specific objection that the trial court's proposed *ex parte* interview of Juror No. 8 would violate Appellant's right to have counsel present. Instead, the trial court understood defense counsel's generic statement, "Judge, just note my objection[,]" as a concluding response made for the record after the trial court had considered, in open court, both defense counsel's request for mistrial-by-juror-impasse and the prosecutor's recommendation of replacing the juror if she were not deliberating as instructed and chose to explore the latter option. N.T. at 34.

Reinforcing the trial court's understanding of the defense counsel's objection as one responding only to the denial of his motion for mistrial was defense counsel's subsequent, post-interview objection that was limited,

again, to the issue of mistrial, as counsel cited decisional law holding that any doubts as to the necessity of a mistrial when confronted by a jury's statement that it cannot reach a conclusion after careful consideration must be resolved in favor of the defendant. N.T. at 35-36. Nowhere did counsel raise in his objection the specific argument that the trial court's chosen course of addressing the issue of a deadlocked jury had violated Appellant's rights to have counsel present at a critical stage of the proceedings.[4]

Pennsylvania Rule of Appellate Procedure 302(a) provides that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). This Court has expounded on the obligation to make a timely and specific objection to preserve the matter for appeal:

> we have long held that claims not raised before the trial court are waived. "It is well established that trial judges must be given an opportunity to correct errors at the time they are made. [A] party may not remain silent and afterwards complain of matters which, if erroneous, the court would have corrected." **Commonwealth v. Strunk**, 953 A.2d 577, 579 (Pa. Super. 2008) (citations omitted). **See also Commonwealth v. Lopata**, 754 A.2d 685, 689 (Pa. Super. 2000) ("A claim which has not been raised before the trial court cannot be raised for the first time on appeal." (citation omitted)). "Even issues of constitutional dimension

_____

[4] During this exchange between defense counsel and the trial court, the court distinguished the present facts from those at issue in the cited mistrial case, by stating, "But this juror is saying she's refusing to discuss the case. That's different. She's not sticking to her position. She's refusing to deliberate anymore." N.T. at 36. Only then did defense counsel acknowledge the *ex parte* nature of the trial court's interview of Juror No. 8, as he stated, "I understand, Judge. I'm obviously not privy to that conversation." N.T. at 36. This statement of fact did not amount to a direct and specific objection that the absence of defense counsel at the interview had denied Appellant of his rights to counsel.

cannot be raised for the first time on appeal." **Strunk**, 953 at 579 (citation omitted).

**Commonwealth v. Spone**, 305 A.3d 602, 608–09 (Pa. Super. 2023).

It is clear from the record that defense counsel understood the trial court's interview of Juror No. 8 could result in the juror's removal if she were found to have disregarded jury instructions  The discussion between the trial court and respective counsel made clear that possibility.  Yet defense counsel neither lodged a specific objection to an *ex parte* communication nor indicated his concern that the *ex parte* communication could deprive his client the right to counsel at a critical phase of the proceedings.  Accordingly, we find this issue waived.

In Appellant's third issue, he contends that the trial court erroneously charged the jury, over defense objection, when it defined "interfere substantially with [the complainant's] liberty/freedom" as follows:

> In determining the magnitude of restraint necessary for false imprisonment, the appellate court has recognized that false imprisonment covers restraints which are less serious than those necessary for the offenses of kidnapping and unlawful restraint.
>
> In determining whether the restraint at issue interfered with another individual's liberty "substantially" the appellate court directs the jury to give the word "Substantially" its plain meaning.
>
> Thus, false imprisonment covers restraints where an individual's liberty is interfered with in an ample or considerable manner."

N.T. 4/18/24, pp. 29-30.

Appellant argues that the aforesaid instruction confused the jury because it described the present offense of false imprisonment as involving

- 17 -

less serious restraints than those involved in the offenses of "kidnapping" or "unlawful restraint." In support of his argument, he references decisions reversing convictions in which a trial judge failed to instruct the jury on the elements of the crime charged. *See*, *e.g.*, *Commonwealth v. Ford-Bey*, 472 A.2d 1062 (Pa. 1984) (observing that without instructing jury on elements of murder, the jury had "no way of knowing the legal basis upon which a conviction for attempted murder must rest).

The governing standard of review applied to a trial court's jury instruction is well-settled:

> A trial court has broad discretion in formulating and delivering instructions to a jury. When reviewing the exercise of that discretion, an appellate court must evaluate the trial court's instruction "as a whole to determine if it was fair or prejudicial."[20] A trial court may use such language as it chooses, "so long as the law is clearly, adequately, and accurately presented to the jury for its consideration."
>
> "We will not rigidly inspect a jury charge, finding reversible error for every technical inaccuracy, but rather evaluate whether the charge sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision." "Error cannot be predicated on isolated excerpts of the charge, but it is the general effect of the charge that controls."

*Commonwealth v. Drummond*, 285 A.3d 625, 634–35 (Pa. 2022)

Initially, we note that the trial court's proposed and eventually administered charge in question tracked, nearly verbatim, this Court's published opinion, *In re M.G.*, 916 A.2d 1179 (Pa. Super. 2007), which discussed how this Court has determined whether the magnitude of restraint imposed by a defendant is sufficient to establish the crime of false

- 18 -

imprisonment.[5] In so doing, the trial court delivered an instruction that satisfied the above-referenced standard of review governing jury charges.

In addition, we distinguish the cases upon which Appellant relies, as each one involved a jury instruction that failed to define or explain the very elements of the crime charged, whereas, in the case *sub judice*, the trial court's instruction defined the elements themselves clearly and appropriately. Specifically, the charge explained that for a jury to determine whether Appellant interfered "substantially" with one's freedom, it was to give the word "substantially" it's plain meaning, and consider that the charge of false imprisonment concerns acts involving "ample or considerable" restraints. Indeed, while the comparative remark may be unnecessary, we discern neither confusion nor prejudice resulting from it, as it was a passing reference couched in a larger and appropriate instruction on the elements of false imprisonment. As such, we reject Appellant's argument that the trial court misstated or delivered a confusing and prejudicial jury instruction on the charge of false imprisonment. No relief is due on this issue.

In Appellant's fourth and final issue, he argues that the evidence was insufficient to establish the offense of false imprisonment because it failed to demonstrate that his actions interfered substantially with the complainant's liberty. We disagree, as the victim's testimony described, and video evidence

---

[5] ***See*** *infra*, for a discussion of ***In re M.G.***.

clearly depicted, how 45 year-old Appellant used his considerable size and strength advantage over a 14-year-old girl to surreptitiously clutch her to his side without consent and walk her against her will for 36 seconds towards a corner of the mall where a nearby exit provided access to his parked car.

When examining a challenge to the sufficiency of evidence, our standard of review is as follows:

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Sebolka*, 205 A.3d 329, 336-37 (Pa. Super. 2019) (quoting *Commonwealth v. Franklin*, 69 A.3d 719, 722-23 (Pa. Super. 2013)).

- 20 -

The facts pertinent to the sufficiency of the evidence inquiry were entered into evidence through shopping mall surveillance video, the victim's cell phone video recording, and the victim's testimony. Together, the evidence established that Appellant, while descending on an escalator, looked back and saw a young girl riding behind him. He waited for her to reach the bottom of the escalator, where he imposed himself by walking right alongside her for several seconds before grabbing her arm and trapping it tightly against his torso. For the next 36 seconds, he capitalized on his hold of by walking her towards a corner of the mall where an arcade exit provided access to his parked car. Once they stopped, he released his hold but still suggested his interest in her even after she told him she was 13 years old.

The totality of this evidence, coupled with the child's emotional aftermath that included her immediate reporting of this encounter to friends and mall security, proved she endured a would-be sex offender's frightening restraint that substantially interfered with her liberty and, thus, supported the jury's verdict of guilty on the charge of false imprisonment. Section 2903(b) of the Crimes Code defines the offense of false imprisonment, in relevant part, as follows:

> (b) False imprisonment of a minor where offender is not victim's parent.—If the victim is a person under 18 years of age, a person who is not the victim's parent commits a felony of the second degree if he knowingly restrains another unlawfully so as to interfere substantially with [her] liberty.

18 Pa.C.S.A. § 2903(b).

"In determining the magnitude of restraint necessary for false imprisonment, this Court has recognized that false imprisonment covers restraints which are less serious than those necessary for the offenses of kidnapping and unlawful restraint." *In re M.G.*, 916 A.2d at 1181-82 (internal footnotes omitted). "In determining whether the restraint at issue interfered with [the minor's] liberty 'substantially,' we give the word 'substantially' its plain meaning. Thus, we determine the General Assembly intended false imprisonment to cover restraints where an individual's liberty is interfered with in an ample or considerable manner." *Id.* at 1182 (internal citations omitted). *See also* 32 Am. Jur. 2d False Imprisonment § 156 (false imprisonment statutes that define qualifying restraints as those interfering substantially with liberty require a "'real' or 'material' interference with the liberty of another, as contrasted to a petty annoyance, a slight inconvenience, or an imaginary conflict."

At trial, the defense focused on how the video evidence depicted not a victim screaming and crying for help but, instead, a girl calmly walking with Appellant, as if the restraint—if there was one at all—was minimal and manageable for her. The victim testified, however, that she was in "shock" from this stranger's sudden, surprise restraint and redirection of her. N.T. (Trial) at 69. The jury could reasonably discern from the depiction of her facial expression during her detention not a sense of calm but a sense of shock, bewilderment, and submission. Such a finding of fact would be consistent with the commandeering she was experiencing, as she testified that she could

not remove herself while Appellant continued to walk her where he wanted to walk and away from her intended destination. N.T. at 67. She explained, "I couldn't get away from him, and that's where he was walking." *Id*. Hence, her feelings of shock.

"Substantial" or "real" restraints or deprivations of liberty may be most easily recognized when offenders assume and retain physical control over victims who either overtly resist or are too young or too elderly to do so. Indeed, appellate decisions affirming false imprisonment convictions occurring outdoors or in public spaces often involve victims or intended victims who fought back, who displayed defiance in the moment, or who were simply too young and overmatched to do so. ***See infra***. Nevertheless, a passive victim's acquiescence caused by shock, confusion, or resignment, which the victim in the case *sub judice* articulated during her trial testimony, is not incompatible with a detention contemplated and proscribed in the crime of false imprisonment.

There is no manifest legislative intent in Section 2903 to exclude from its protections those victims, often young victims, who silently retreat inward in response to adults' commandeering and restraints instead of lashing out in defiance of such acts. Here, the involvement of an overwhelmed child victim struck speechless upon Appellant's restraint, and the paralyzing distress she claims to have felt during the episode, must be factored against Appellant when assessing the gravity of his restraint and its effect on his victim's liberty.

Similarly, the relatively short duration of the detention at issue does not remove it from Section 2903 and relegate it, instead, exclusively to the realm of civil law false imprisonment. The Comment to Section 2903 illustrates a distinction between a civil law false imprisonment and the crime of false imprisonment, and it cautions that the statute is not intended to penalize every detention—such as a short detention—which might serve as the basis for only a civil suit for false imprisonment.

It is noteworthy, however, that the Comment's example of such a detention involves a theft victim subjecting the suspected thief to a brief detention for purposes of relevant questioning only. In that example, there is at least an element of ostensible good faith and an explanation offered to the person detained.[6] In contrast, the detention at issue here is one devoid of either good faith or any acceptable explanation, as it stems from a middle-aged man's predation of a 14 year-old girl that quickly evolves into a forcible transport of the girl and an insinuated proposition in which he lies considerably about his age and asks if he's too old for her after learning her age.[7]

This Court has recognized that proof of a substantial interference with one's liberty under Section 2903(b) does not require satisfaction of a prescribed minimum temporal threshold. In ***Commonwealth v. Salgado-***

---

[6] Also, there is no suggestion in the Comment that the described detainee was physically restrained, as is the case here.

[7] There is no suggestion in the Comment that the detainee is a child who is at a physical and life experience disadvantage, as was the case here.

***Ochoa***, (non-precedential memorandum decision) 321 A.3d 979 (Pa. Super. 2024),[8] a three-judge panel of this Court held that even without physically restraining the child, the "mental trauma" resulting from a non-parent's one minute closing of child's bedroom door, blocking the exit, and refusing to let child leave the room "was a substantial interference with [the child's] liberty, even if only for one minute." ***Id.*** at *3.

Similarly, in ***Commonwealth v. Lima***, (non-precedential memorandum decision) 256 A.3d 47 (Pa. Super. 2021), the defendant was charged with criminal attempt false imprisonment on allegations that he had approached a thirteen year-old girl while she was walking home from school and grabbed her under her arms in a "bear hug" momentarily until the girl unexpectedly cut short defendant's hold by elbowing him and running away. Evidence also included the prelude to the physical encounter, wherein the defendant had driven his car alongside the curb where the girl was walking and had asked her for her name.

In rejecting the defendant's challenge to the sufficiency of the evidence offered to prove criminal attempt at false imprisonment, a panel of this Court adopted the trial court's opinion, which observed in relevant part:

> As previously discussed, Defendant did not accidentally bump into the victim on the street. Rather, while Defendant was

_____

[8] Under Pa.R.A.P. 126(b), we may cite and rely on non-precedential decisions filed after May 1, 2019, for their persuasive value.

still in his car, he asked the victim for her name, then drove around the block a second time before parking, exiting the car, and acting as if he was going into a house before approaching her from behind and grabbing her under her arms. The Commonwealth established that, in grabbing her under the arms, Defendant was intentionally taking a substantial step toward restraining L.Q. unlawfully so as to interfere substantially with her liberty. It is clear that when he grabbed her under her arms, Defendant attempted to interfere with L.Q.'s liberties in an "ample or considerable manner."

The record shows that Defendant's attempt to restrain L.Q. was unexpectedly cut short when she elbowed him and she was able to run away. The fact that the length of time he was able to restrain her was stopped sooner than he may have intended does not require a different result. *See*, *In re M.G.*, *supra*. (Evidence was sufficient to show that assailant interfered substantially with the victim's liberty after locking her in her bedroom and touching her in a sexual manner for less than two minutes before being thwarted by the victim's sister banging on the door.)

Because the jury here could reasonably have determined that all of the necessary elements of criminal attempt at false imprisonment were established, Defendant's allegation of error must fail.

*Lima*, 256 A.3d 47 at *1.

In the case *sub judice*, the victim testified that Appellant's 36-second forcible commandeering of her caused her great distress and "shock." The jury, sitting as finder of fact at her trial, considered both this testimony and the corresponding video evidence and concluded reasonably that the victim suffered real mental anguish from having endured a terrifying experience in which Appellant substantially interfered with her personal liberty. Because we deem the evidence legally sufficient to support the jury's verdict, we affirm judgment of sentence.

Judgment of sentence is AFFIRMED.

Judge Dubow joins this Opinion.

Judge Kunselman files a Dissenting Opinion.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/12/2026